# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:09-MD-02036-JLK**

---

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**
**FIRST TRANCHE ACTIONS**

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

---

**JOINT DECLARATION OF ROBERT C. GILBERT AND**
**MICHAEL W. SOBOL IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT,**
**APPLICATION FOR SERVICE AWARDS, AND CLASS COUNSEL'S**
**APPLICATION FOR ATTORNEYS' FEES**

ROBERT C. GILBERT and MICHAEL W. SOBOL declare as follows:

1.       We are counsel of record for Plaintiffs and the proposed Settlement Class in these

coordinated proceedings against Bank of America, N.A.  We respectfully submit this joint

declaration in support of Plaintiffs' Motion for Final Approval of Settlement, Application for

Service Awards and Class Counsels' Application  for Attorneys' Fees.  Except as otherwise

noted, we have personal knowledge of the facts set forth in this declaration, and could testify

competently to them if called upon to do so.

2.     On May 6, 2011, after more than two years of hard-fought litigation, and several months of arm's-length negotiation, Plaintiffs and Bank of America, N.A. ("BofA" or the "Bank") executed the Settlement Agreement and Release ("Agreement") under which BofA will pay $410 million in cash to the Settlement Class.[1]  The entirety of the "Net Settlement Fund" will be distributed directly to Settlement Class Members in proportion to the actual harm that each of them sustained, without Settlement Class Members having to submit a claim form or take any other affirmative step.

3.     Plaintiffs maintain that the claims asserted in the Action are meritorious, that any motion for class certification would prove successful, and that Plaintiffs would prevail if this matter proceeded to trial.  The Action involved sharply opposed positions on several fundamental legal and factual issues.  The ultimate success of the litigation required Plaintiffs to prevail, in whole or in part, on *all* of these issues.  Conversely, BofA's success on any one of these issues could have spelled defeat for Plaintiffs and the Settlement Class.  Therefore, continued litigation, presents significant risks to attaining a successful judgment, as well as the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and the countless uncertainties of litigation, particularly in the context of a large and complex multi-district litigation.

4.     In light of the risks presented by continued litigation, and taking into account the substantial benefits extended to the Settlement Class Members under the terms of the Settlement Agreement, the Settlement not only provides fair and adequate compensation to the Settlement Class Members, it represents a significant achievement benefitting the Settlement Class.

---

[1] All capitalized terms have the same meaning as defined in the Agreement attached as Exhibit A to Plaintiffs' Motion for Final Approval of Settlement, Application for Service Awards and Class Counsels' Application  for Attorneys' Fees and Expenses.  Any capitalized terms not defined there are defined herein.

### A.    Background of the Litigation

5.    Plaintiffs allege that BofA systemically re-sequenced Settlement Class Members' debit transactions for the sole purpose of maximizing its overdraft fee revenue.  According to the operative complaints, BofA's practices violated its contractual and good faith duties owed to its customers; BofA's acts resulted in unlawful conversion of depositor property; BofA's contractual provisions and practices were substantively and procedurally unconscionable; and BofA's conduct violated certain state unfair trade practices statutes, and resulted in it being unjustly enriched.

6.    BofA, on the other hand, consistently argued, *inter alia*, that Plaintiffs' claims were preempted by the National Bank Act ("NBA"); that its account agreements expressly authorized the very re-sequencing practice Plaintiffs challenged; that it fully disclosed its practices to its customers; that no unconscionability cause of action exists for damages; that no plausible conversion claim existed because Plaintiffs did not own the funds in their accounts; that Plaintiffs could not maintain unjust enrichment claims because of the existence of an express agreement; that the consumer protection claims were defective; that the federal Office of the Comptroller of the Currency ("OCC") endorses the Debit Re-sequencing at issue; and that, moreover, the vast majority of the claims brought against it were extinguished based on a nationwide settlement of a class-action suit in California state court.

### B.    The Course of Proceedings.

7.    On December 1, 2008, Plaintiff Ralph Tornes filed a complaint against BofA in this Court.  *See Tornes v. Bank of America, N.A.*, S.D. Fla. Case No. 08-23323.  On December 23, 2008, Tornes filed an amended complaint.  On April 9, 2009, Plaintiffs Steve Yourke and Kristin Richards filed a complaint against BofA in San Francisco County Superior Court, which

was removed to the United States District Court for the Northern District of California.  *See Yourke v. Bank of America, N.A.*, N.D. Cal. Case No. 09-cv-02186.

8.      Both the *Tornes* and *Yourke* complaints asserted claims against BofA based on its alleged unfair assessment and collection of overdraft fees on behalf of putative classes of BOA's customers.  *Tornes* Compl. ¶ 21.  *Tornes* asserted claims for breach of contract, abuse of rights, unconscionability, trover and conversion, unjust enrichment, and usury, on behalf of all BofA customers nationwide.  *Id.* ¶¶ 29–62.  The *Yourke* complaint brought claims on behalf of a putative California class of BofA customers.  Yourke Compl. ¶ 40.  The *Yourke* complaint asserted claims based on violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; the Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*; and the common law doctrines of conversion, breach of the implied covenant of good faith and fair dealing, unjust enrichment and restitution.  Yourke Compl. ¶¶ 88–126.

9.      Plaintiffs brought these cases seeking monetary damages, restitution and declaratory relief, arising from the BofA's alleged Debit Re-sequencing, that Plaintiffs contend were devised to increase the number of overdraft fees its customers incurred.  *See generally Tornes* Third Amended Consolidated Class Action Complaint ("TAC") [**DE # 344**]; *Yourke* Amended Class Action Complaint [**DE # 345**].  Because BofA manipulated the order in which customers' debit transactions were posted, customers' funds were depleted more rapidly than they should have been, and Plaintiffs and Settlement Class Members allegedly paid more overdraft fees than they should have paid.

10.     On June 10, 2009, the Judicial Panel for Multidistrict Litigation ("JPML") transferred the *Tornes* and *Yourke* Actions, as well as similar cases pending against several other banks involving allegations of unfair assessment and collection of overdraft fees, to this Court

for coordinated pre-trial proceedings under MDL No. 2036.  [**DE # 1**].  Additional tag-along actions asserting similar claims against BofA were filed across the country and later transferred by the JPML to this Court.

11.     Following transfer and centralization, Class Counsel interviewed over 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers.  This information was essential to Class Counsel's ability to understand the nature of BofA's conduct, the language of the account agreements at issue, and potential remedies.  Class Counsel also expended significant resources researching and developing the legal claims at issue.  Some of the named plaintiffs in tag-along actions transferred by the JPML to this Court were added to the *Tornes* Second Amended Complaint filed on November 10, 2009.  *See* S.D. Case No. 1:08-cv-23323-JLK, DE # 58.  Plaintiffs elected not to amend the *Yourke* complaint (as BofA had already answered the *Yourke* complaint prior to the formation of MDL 2036).

12.     Soon after the filing of these complaints, BofA, joined by the other First Tranche defendants (Citibank, N.A.; JPMorgan Chase Bank, N.A.; Union Bank, N.A.; U.S. Bank, N.A.; Wachovia Bank, N.A.; and Wells Fargo Bank, N.A.) filed a 96-page Omnibus Motion to Dismiss and/or for Judgment on the Pleadings (the "Omnibus Motion").  [**DE # 217**].  Two of BofA's primary arguments focused on federal preemption and the language in its account agreement.

13.     First, BofA argued that Plaintiffs' state-law claims conflict with the NBA and its implementing regulations.  It insisted that the ordering of debits falls within the bank's federally-authorized deposit-taking powers and, as such, cannot be regulated under state law.  Further, it added, the federal agency responsible for regulating national banks specifically indicated that various methods of posting and ordering debits are permissible under federal law.  Therefore,

BofA argued that any attempt to use state laws to reach account posting would not only interfere with core banking operations, but would also pose a clear conflict with federal law. *Id.* at 19-34.

14.    Second, BofA pointed to its deposit account agreement, which informs customers, among other things, that the bank "do[es] not process and post transactions in the order in which they occurred." *Tornes* TAC, Ex. A at 18. The agreement also states that the bank "may" post debits in any order it chooses. *Id.* Based on these provisions, BofA advanced the position that there can be no contractual breach, including a breach of an implied contractual duty of good faith, when the contract at issue expressly permits the complained-of practice and includes as a material term the very possibility of high-to-low posting. Thus, BofA claimed that it adequately disclosed its debit re-sequencing practices and that it could not be held liable for Plaintiffs' decision to maintain BofA checking accounts under a contract authorizing such practices. [**DE # 217 at 40-55**].

15.    After extensive research and drafting, Plaintiffs filed a 98-page brief in opposition. [**DE # 265**]. At the banks' urging, the Court stayed discovery in the First Tranche actions pending resolution of the Omnibus Motion. An all-day argument on the Omnibus Motion took place before this Court on February 25, 2010. [**DE # 294**].

16.    On March 11, 2010, this Court issued its Order Ruling on Omnibus Motion to Dismiss. [**DE # 305**]. *See In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010). In a thorough opinion that addressed several complex legal questions, the Court: (1) considered and rejected the banks' federal preemption defense in the Rule 12 posture; (2) disagreed with the banks' assertion that the terms of customer account agreements allowed them to engage in the challenged Debit Re-sequencing conduct notwithstanding the covenant of good faith and fair dealing, and reserved the ultimate question of whether the banks acted in

good faith for a later stage, after discovery; (3) rejected the banks' contention that the OCC's conclusion – that high-to-low posting of checks falls within the banks' authority – should also apply to debit card transactions; (4) concluded that Plaintiffs sufficiently pled procedural and substantive unconscionability, citing the disparity in bargaining power, inconspicuous and boilerplate contractual language regarding overdrafts, and the fact that the fees resulting from the banks' Debit Re-sequencing bear no reasonable commercial relationship to the costs or risks associated with providing the overdraft service; (5) preserved the unjust enrichment claim as an alternative ground for relief; (6) refused to dismiss the conversion claim, noting Plaintiffs' right to possess the funds in their accounts; (7) dismissed without prejudice the state statutory claims where no named plaintiff resided in the relevant states; (8) maintained certain state statutory claims alleging deceptive, unfair, and unconscionable practices; (9) dismissed state statutory claims with pre-suit notice requirements; and (10) dismissed state statutory claims where Plaintiffs failed to plead required predicate acts.  *Id.* at 1310-28.

17.    On April 12, 2010, Plaintiff Tornes and Plaintiffs Blair, Bylin, Chelo, Conroy, Di Frances, Gipson, Hanny, Haqq, Holloway, James, Kopp, Marshall, Molitor, Mosley, Norman, Richardson, Palmer, Powell, Sherman, Wagner, Weatherspoon, and Werking filed the Third Amended Consolidated Class Action Complaint, and Plaintiffs Yourke and Richards and Plaintiffs Brull and Morland filed an Amended Class Action Complaint.  [**DE # 344, 345**].  BofA answered the complaints on May 21, 2010, asserting 37 affirmative defenses in each answer. [**DE # 496, 497**].  BofA's defenses included "Federal Preemption Under the National Bank Act and Implementing Regulations" (Second Affirmative Defense), "Absence of Reliance" (Twenty-First Affirmative Defense), "Absence of Causation" (Twenty-Second Affirmative Defense), "Contractual Terms" (Thirty-Second Affirmative Defense), and "Arbitration" (Thirty-Fourth

Affirmative Defense).  *Id.*  Additionally, BofA asserted that the claims brought in the operative complaints were released, in whole or in part, by virtue of the class action settlement entered into and approved in *Closson*, the prior California state court action (discussed below).  *Id.* ¶¶ 181, 182.

18.     Class Counsel and counsel for BofA (along with counsel for other First Tranche banks) engaged in extensive discussions and negotiations regarding a proposed pretrial discovery plan and schedule.  On May 13, 2010, after the parties were unable to reach agreement, the Court lifted the stay of discovery and entered a comprehensive Order Establishing a Schedule for the Discovery, Motion Practice, Final Pretrial Conference, and Trial for Selected Cases.  [**DE # 463**].  That same day, Plaintiffs served identical written discovery requests on the First Tranche banks, including BofA, seeking substantial documents and information in their possession, custody and control which are probative of and relevant to the claims and defenses in these actions.  Mindful of the Court's emphasis on the development of the factual record in its denial of most points raised in the Omnibus Motion, Plaintiffs crafted document requests and interrogatories with an eye toward class certification, summary judgment, and trial.

19.     After the Parties negotiated and entered into a Stipulated Protective Order relating to the production of documents and information [**DE # 688**], BofA produced over one million pages of documents, answered interrogatories and requests for admission.  BofA also asserted extensive objections to Plaintiffs' discovery requests.  Class Counsel engaged in lengthy conferences and meetings with counsel for BofA (and other First Tranche banks) in an effort to resolve discovery objections, issues pertaining to Rule 30(b)(6) deposition topics, and other discovery-related issues.  On July 16, 2010, Plaintiffs moved to compel discovery from BofA. [**DE # 691**].

20.     Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort and code the one million pages of documents produced by BofA.  To make the review and subsequent litigation more efficient, Class Counsel established uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.   Phillips, Erlewine & Given, LLP, one of the Class Counsel firms which originally filed *Yourke*, was one of the firms responsible for overseeing the document review team and assisting with related discovery.

21.     Class Counsel also expended significant effort to prepare responses to Bank of America's requests for documents maintained by Plaintiffs.

22.     On July 19, 2010, the Eleventh Circuit issued *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010), instantly placing the viability of these claims in doubt.  *Cappuccitti* created delay and uncertainty in this action for several months.  The original panel decision held that, under the Class Action Fairness Act of 2005, a court lacks jurisdiction over a claim originally filed in federal court unless at least one of the plaintiffs alleges an amount in controversy exceeding $75,000.  On September 8, 2010, this Court temporarily stayed all further proceedings in this multidistrict litigation pending the outcome of *en banc* proceedings in *Cappuccitti*.  [**DE # 790**].  Nonetheless, during the stay Plaintiffs continued to press discovery issues with BofA and the other defendants, meeting and conferring in person on important fundamental discovery issues such as the scope of document production and the depositions of corporate designees with knowledge of issues central to the case.  On October 15, 2010, the Eleventh Circuit panel vacated its original decision and issued a new opinion, allowing this

Court to lift the stay so that this litigation could proceed.  *Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118 (11th Cir. 2010).

23.     During the Summer and Fall of 2010, Class Counsel also prepared objections and responses to BofA's extensive discovery requests to Plaintiffs, including requests for production of documents and interrogatories, and successfully defended against BofA's motion to compel discovery.  [**DE # 902, 939, 1016**].  Beginning in late 2010, Class Counsel also began deposing certain Bank of America witnesses and scheduling the depositions of many others.

##### C.     The *Closson* Settlement.

24.     After Plaintiffs commenced the Action against BOA, Class Counsel learned that a proposed nationwide class action settlement in a similar case brought against BofA –*Closson v. Bank of America*, San Francisco Superior Court, No. CGC-04-436877– threatened to bar the claims asserted by Plaintiffs and Settlement Class Members in these actions based on an extremely broad release language.  In an effort to preserve such claims, Class Counsel undertook significant efforts to object to, and then to appeal, the California trial court's approval of the *Closson* settlement.  *See Jan L. Petrus, et al. v. Rhonda J. Closson, et al. & Bank of America, N.A.*, California Court of Appeal Nos. A125963, A126230, A126606, A126608.

25.     Class Counsel's decision to challenge approval of the *Closson* settlement, and our sustained efforts in pursuit of this objective, proved critical to the excellent relief achieved for the Settlement Class in the Action.

26.     *Closson* was filed in 2004 on behalf of a class of BofA customers.  Like Plaintiffs here, the plaintiffs in *Closson* originally alleged claims for unfair business practices in connection with BofA's overdraft fee policies and practices.  However, after the trial court judge indicated that such claims might be preempted by federal law, the plaintiffs in *Closson* limited their claims to those involving alleged false advertising by BofA, dropping any  challenge to the

legality of BofA's Debit Re-sequencing.  Lacking significant discovery into BofA's overdraft practices, the parties in *Closson* reached a $35 million settlement in July 2008.  Under its terms, *Closson* class members were required to submit claims to participate in the recovery, and each class member's recovery was capped at $78.

27.     Despite the limited scope of the plaintiffs' claims in *Closson*, the parties agreed to a very broad, all-encompassing release, not only of the claims at issue in *Closson*, but of all claims relating in any manner to BofA's overdraft practices, including the illegality of the practices themselves, chief among them being BoA's Debit Re-sequencing.  Indeed, in its Motion to Stay the original *Tornes* matter, BofA asserted that "the nationwide class action settlement in *Closson*, which has already been preliminarily approved by the state court, will have the effect of resolving and releasing all or most of the purported claims asserted in this action. . . ."  **[DE # 17** in Case No. 08-cv-23323].

28.     Based on a review of the *Closson* settlement release and an analysis of the data made available by BofA, Settlement Class Counsel estimate that if it were enforceable, the *Closson* settlement release would release approximately *80 percent* of the aggregate value of Settlement Class Members' claims in the Action.

29.     To prevent the *Closson* settlement from releasing the claims at issue here, Ralph Tornes – plaintiff in the *Tornes* action – and Jessica Grinstead – a BofA customer – filed objections to the *Closson* settlement challenging, among other things, its overly-broad release. In June 2009, while those objections were pending, and before the California trial court ruled on final approval in *Closson*, the JPML created this MDL and transferred the *Tornes* and *Yourke* Actions to this Court.

30.     Recognizing that the release in *Closson*, if enforceable, threatened to prevent customers from recovering all or most of their damages resulting from Debit Re-sequencing, Class Counsel diligently pursued the objections on behalf of Mr. Tornes and Ms. Grinstead, and for the benefit of all Settlement Class Members.  After the California trial court overruled their objections and granted final approval of the *Closson* settlement in August 2009, Mr. Tornes and Ms. Grinstead pursued a coordinated appeal in *Closson*.  The pursuit of that appeal, involving exhaustive research and full appellate briefing on a host of complex legal and factual issues, had a major impact on the eventual Settlement reached in this Action.

   D.     <u>**Settlement Negotiations in the MDL.**</u>

31.     Settlement Class Counsel and counsel for BofA first began preliminary settlement discussions in mid-October 2010.  In mid-November 2010, BofA indicated that it wished to participate in formal mediation proceedings, and proposed that Professor Eric Green, a nationally prominent mediator, preside over the mediation proceedings.  Settlement Class Counsel agreed to participate in mediation and to Professor Green's selection as the mediator.

32.     The first mediation session was held in Boston on December 17, 2010.  During the first session, the Parties discussed their relative views of the law and facts, and potential relief for the proposed Class.  The Parties also made initial settlement demands and offers.  The first mediation session ended without any agreement, and the Parties agreed to resume mediation in late January 2011.

33.     The second and third mediation sessions were held on January 26 and 27, 2011, in Charlotte.  Professor Green continued to preside over the mediation proceedings.  During the second session, the Parties exchanged a series of counter-proposals on key aspects of the Settlement.  At times during the second day of mediation, it appeared that the Parties were nearing an impasse.  Nevertheless, on January 27, 2011, during the third day of mediation, the

Parties reached agreement on all material terms of the Settlement and executed a Memorandum of Understanding ("MOU") that memorialized their agreement.  The MOU provided, in relevant part that BoA would pay $410 million to create a common fund for the benefit of the Settlement Class, would receive in exchange a full release of all claims, and that the parties would seek the dismissal of the appeal in *Closson* once the Settlement received final approval.  The MOU also provided that the Settlement was contingent on the Parties' drafting and execution of a comprehensive settlement agreement.

34.     At all times throughout the mediation proceedings, the negotiations were adversarial, non-collusive and at arm's length.

35.     On February 4, 2011, the Parties filed a Notice of Settlement.  [**DE # 1135**].

36.     Several months of painstaking negotiations regarding the specific terms of the Agreement followed.  During the same time, Settlement Class Counsel and their expert Arthur Olsen performed the detailed work necessary to determine the exact amount of each Settlement Class Member's damages based on the high-to-low Debit Re-sequencing, and the proposed plan of allocation of the Net Settlement Fund.  The negotiations with BofA's counsel also included the plan of allocation.

37.     The negotiations and drafting of the formal written Agreement were finally concluded in early May, and the Settlement Agreement was executed between May 6 and May 11, 2011.

38.     On May 13, 2011, Plaintiffs filed their Motion for Preliminary Approval of the Settlement.  [**DE # 1471**].  A preliminary approval hearing was held on May 23, 2011 [**DE # 1517**], at which time the Court announced its intention to grant preliminary approval, commenting that the Settlement Class and the Settlement were among the largest ever presented

to this Court.  On May 24, 2011, the Court entered the Order Granting Preliminary Approval [**DE # 1520**] which, *inter alia*, preliminary approved the Settlement, finding that the Settlement Class met the requirements of Fed. R. Civ. P. 23, the Settlement was "the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel" and was "not the result of collusion," the Settlement is "within the range of reasonableness" and that is should be approved.  [**DE # 1520 at 2**].

   **E.**  **Settlement Recovery**

  39.  Pursuant to the Settlement, on June 7, 2011, Bank of America deposited $410 million into an Escrow Account.  Agreement ¶ 47.  That deposit created the Settlement Fund, which will be used to pay all distributions, fees, costs and expenses of the Settlement including, but not limited to, distribution of money to the Settlement Class Members; distribution of the *Cy Pres* Distribution Amount; all costs of Settlement Notice; all costs of Settlement Administration; all attorneys' fees, costs and expenses of Class Counsel, and all Service Awards for Plaintiffs. Agreement ¶¶ 47, 50.

  40.  Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement.  Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶22), Bank of America and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class members who do not opt out of the Settlement, and to the recipients of the *Cy Pres* Distribution Amount.  Agreement ¶¶ 83, 91.

  41.  Settlement Class Members have been identified through a complex analysis of Bank of America data, conducted by Settlement Class Counsel's expert, Arthur Olsen.  Mr. Olsen is submitting his own declaration in support of Final Approval of the Settlement, which is attached to the Motion for Final Approval.  As Mr. Olsen explains, his analysis allows for the

identification of Settlement Class members who experienced excess overdraft fees as a result of re-sequencing of debit card transactions.  Bank of America's data for the period January 1, 2004 through Preliminary Approval was sufficiently complete to permit the Parties to identify all Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement.

42.     Bank of America lacked certain relevant data for the earliest part of the Class Period, however.  For the period January 1, 2001 through September 30, 2003, Bank of America lacked data that would permit Settlement Class Counsel and their experts to identify the actual customers who were affected by the Bank's Debit Re-sequencing practices during that period.  Also, for the period October 1, 2003 through December 31, 2003, Bank of America lacked data that would permit Settlement Class Counsel and their experts to identify certain segments of customers that were affected by the Bank's Debit Re-sequencing practices during that period.  Agreement ¶78.

43.     After consultation with their experts, Settlement Class Counsel previously estimated that between 5% and 14% of Settlement Class Members' damages occurred during the periods for which data was not available from Bank of America.  Once Settlement Class Counsel's experts completed their analysis of the data, they calculated that roughly 12.5% of Settlement Class Members' damages occurred during the periods for which data was not available.  .  *See* Declaration of Arthur Olsen attached to the Motion for Final Approval.

44.     Because Settlement Class Members for those periods cannot be identified and, therefore, cannot be paid directly, the Parties agreed that 12.5% of the Net Settlement Fund will be allotted to a *cy pres* program that is intended to benefit consumer financial literacy education, and to educate and assist consumers with financial services issues through advisory and related

services (excluding litigation).  Agreement ¶¶ 82, 91.  The Settlement Administrator will disburse the *Cy Pres* Distribution Amount within 30 days of the Effective Date.  *Id.*  The *cy pres* recipients will be agreed upon by the Bank and Settlement Class Counsel, and submitted to this Court for its approval . *Id.*

### F.   **Class Release.**

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released BofA from claims related to the subject matter of the Action.  The detailed release language can be found in Section XV of the Agreement.

### G.   **Settlement Notice**

45.     Settlement Class Counsel retained one of the leading class action notice experts in the country, Kinsella Media, to serve as the Notice Administrator for this Settlement.

46.     The Notice Program was reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, class certification, the terms of the Settlement, Class Counsel's Fee Application and request for Service Awards for Plaintiffs, and their rights to opt-out of the Settlement Class and object to the Settlement, Class Counsel's Fee Application and/or the request for Service Awards for Plaintiffs.  The Notice and Notice Program constituted sufficient notice to all persons entitled to notice.  The Notice and Notice Program satisfied all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the Constitutional requirements of due process.

### 1.   **Mailed Notice**

47.     The Settlement Administrator, Rust Consulting ("Rust"), is one of the leading class action settlement administrators in the United States.  Rust administered the Mailed Notice Program in accord with the terms of the Settlement and the Court's Preliminary Approval Order.

After running the names and last known addresses of the identifiable Settlement Class Members through the National Change of Address Database, Rust mailed to all such Settlement Class Members postcards that contained the Mailed Notice (the "Initial Mailed Notice").  Notice of the Settlement was mailed to over 13 million members of the Settlement Class.

48.     Rust also performed reasonable address traces for all Initial Mailed Notice postcards that have been returned as undeliverable.  Rust timely completed the re-mailing of Mailed Notice postcards to those Settlement Class Members whose new addresses were identified through address traces (the "Notice Re-mailing Process").

49.     Rust timely completed the Mailed Notice Program (both the Initial Mailed Notice and the Notice Re-mailing Process) by September 2, 2011.  *See* Declaration of Joel Botzet attached to the Motion for Final Approval.

### 2.     Published Notice

50.     The Published Notice Program, for which Kinsella is responsible, was comprised of the following components: one full-page advertisement in People magazine, one full-page advertisement in Sports Illustrated magazine, and one full-page advertisement in TV Guide; web advertising on Facebook.com, Microsoft Media Network, Yahoo! Network, and 24/7 Network ("Web Advertising"); and sponsored keyword search advertisements on the internet.  The Published Notice Program was timely completed by September 2, 2011.  *See* Declaration of Kathy Kinsella attached to the Motion for Final Approval.

### 3.     The Settlement Website, Web Advertising and the Toll-Free Settlement Line

51.     The Settlement Administrator also established a Settlement Website as a means for Settlement Class Members to obtain notice of, and information about, the Settlement.  The Settlement Website includes hyperlinks to the Settlement, the Long-Form Notice, the

Preliminary Approval Order, and certain other documents which Settlement Class Counsel and counsel for BofA agreed to post.  A number of these documents were also translated into Spanish and posted on the Settlement Website.  These documents will remain on the Settlement Website at least until Final Approval.

52.     Further, the Settlement Administrator established and maintains an automated toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, and to answer the questions of Settlement Class Members who call with or otherwise communicate such inquiries.

### H.     Considerations Supporting Settlement

#### 1.     There Was No Fraud or Collusion

53.     The Court is well aware of the vigor with which the Parties litigated prior to reaching the Settlement.  Plaintiffs continue to litigate this matter against other defendant banks, and the sharply contested nature of the proceedings in this case readily demonstrates the lack of fraud or collusion behind the Settlement.

54.     Settlement Class Counsel negotiated the Settlement with similar vigor.  Plaintiffs were represented by experienced counsel at these arms-length negotiations.  Settlement negotiations were informed by the experience of counsel for both sides in the litigation, certification, trial, and settlement of nationwide class action cases.  In particular, Settlement Class Counsel had the benefit of years of experience and a familiarity with the facts of this case as well as with other cases involving similar claims.

55.     As detailed above, Settlement Class Counsel conducted a thorough investigation and analysis of Plaintiffs' claims and engaged in extensive formal discovery with Bank of America.  Settlement Class Counsel's review of that extensive discovery enabled us to gain an

understanding of the evidence related to central questions in the case, and prepared us for well-informed settlement negotiations.

56.     Our settlement negotiations were further aided by virtue of the fact that certain Settlement Class Counsel successfully pursued similar claims against Wells Fargo Bank, N.A. through class certification, summary judgment, and a two-week trial that resulted in a $203 million plaintiffs' verdict.  That case, *Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-cv-5923 (N.D. Cal), was filed in the Northern District of California in 2007 on behalf of a class of California Wells Fargo customers.  As this Court is aware, the *Gutierrez* plaintiffs challenged high-to-low posting practices almost identical to those challenged in this case.  The JPML excluded *Gutierrez* from this MDL because *Gutierrez* was virtually trial ready at the time this MDL was created.

57.     Thus, Settlement Class Counsel were well-positioned to evaluate the strengths and weaknesses of Plaintiffs' claims, as well as the appropriate basis upon which to settle them, as a result of their participation in a full bench trial of similar claims in federal court in California.

58.     Moreover, the three days of mediation, spanning over a two month period, were overseen by Professor Eric Green, a nationally prominent mediator.  The settlement negotiations and mediation sessions were, at all times, adversarial and conducted at arm's length.  At one point during the second day of mediation, it appeared as if the Parties were on the verge of reaching an impasse.

### 2.     The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

59.     This case involves millions of Settlement Class Members and wrongful overdraft fees in the billions of dollars.  The claims and defenses are complex; litigating them is difficult

and time consuming.  Although the Action has been pending for more than two years, recovery by any means other than settlement would require additional years of litigation in this Court and appellate courts.  In contrast, the Settlement provides immediate and substantial benefits to millions of BofA customers.

### 3. The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement

60.    Significant discovery occurred in this case prior to the Settlement.  While that discovery is not complete, it nonetheless afforded Settlement Class Counsel insight into the strengths and weaknesses of their claims against BofA.  Before settling, we had already developed ample information and performed extensive analyses from which to assess the probability of success on the merits, the possible range of recovery, and the likely expense and duration of the litigation.

### 4. Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief

61.    Plaintiffs and Settlement Class Counsel are confident in the strengths of their case, but we are also pragmatic in our awareness of the various defenses available to Bank of America and the risks inherent to litigation.  While Plaintiffs overcame the risk of dismissal on various theories advanced at the motion to dismiss stage, including federal preemption and a legal challenges to the common law and state statutory claims, the ultimate success of Plaintiffs' claims turned on these and other questions that were certain to arise in the context of motions for summary judgment and at trial.

62.    While Plaintiffs and Settlement Class Counsel believe we have a compelling case against BofA, we are mindful of the fact that BofA advanced significant defenses we would be required to overcome at summary judgment, at trial, and eventually on appeal.  This litigation involved several major risks: (1) the *Closson* settlement release; (2) NBA preemption; (3) the

BofA account agreement; and (4) arbitration.  Settlement Class Counsel and Plaintiffs thus appreciate that, absent a settlement, it would have taken years of additional litigation – and overcoming vigorous legal and factual defenses – to bring the Action to finality.  Even then, the outcome would still be uncertain.  Given the myriad risks attending these claims, the Settlement cannot be seen as anything other than a fair compromise.

63.     Protracted litigation carries inherent risks and inevitable delay.  Under the circumstances, Plaintiffs and Settlement Class Counsel determined that the Settlement reached with Bank of America clearly outweighs the risks of continued litigation.

### 5.    The Settlement Amount is Reasonable Given the Range of Possible Recovery

68.     The Settlement provides substantial value to the Settlement Class.  Such value is well within the range of reasonableness.  Under the Settlement, Plaintiffs and the Settlement Class have recovered $410 million, which represents between  45% and 9% of their anticipated total recovery, depending on how the *Closson* appeal was resolved (and presuming it would affect 80% of the aggregate value of the litigation).

69.     In reaching the Settlement in this case, the Parties were forced to consider the impact of the *Closson* settlement.  Though we challenged final approval of the *Closson* settlement in the trial court and on appeal, the very broad release in that settlement could arguably have released the claims of Plaintiffs and Settlement Class Members for an overwhelming majority of the Class Period for the claims in this Action.

70.     Certain Settlement Class Counsel filed objections to the *Closson* settlement on behalf of customers aggrieved by Bank of America's allegedly unlawful debit re-sequencing practices. The California Superior Court overruled those objections, as well as those of other

objectors, and granted final approval to the *Closson* settlement.  Several objectors appealed the *Closson* settlement final approval to the California Court of Appeal, First Appellate District.

71.     Based on a review of the *Closson* settlement release and an analysis of the data made available by Bank of America, Settlement Class Counsel estimate that, if it were enforceable, the *Closson* settlement release could potentially release as much as 80% of the aggregate value of Plaintiffs' and Settlement Class Members' claims in this Action.

72.     The *Closson* settlement therefore presented a substantial risk to Plaintiffs' potential damages claims.  Taking into account that the *Closson* settlement threatened to almost eliminate most of the alleged damages, the $410 million recovery is outstanding.

73.     Moreover, the absence of a claims-made process here speaks volumes about the propriety of settlement approval.  Settlement Class Members will receive the benefit *automatically*, without needing to fill out *any* claim form or indeed to take any action whatsoever.  In stark contrast to the pro-consumer, automatic distribution of the Net Settlement Fund under this Settlement, the *Closson* settlement, as well as two more recent settlements of overdraft fee cases, all required potential settlement class members to submit claims forms themselves in order to receive benefits.

74.     The Settlement also provides for a *cy pres* program for funds due to Settlement Class Members who cannot reasonably be identified and, therefore, cannot be paid directly, as well as for any undisbursed amounts in the Settlement Fund.  The funds will be distributed to *cy pres* relief to benefit consumer financial literacy education, and to educate and assist consumers with financial services issues through advisory and related services.  The *cy pres* doctrine permits courts to distribute unclaimed settlement amounts to worthy charities, especially to charities whose purposes harmonize with the underlying lawsuit, as here.

75.     The proposal here comports with the law of *cy pres* and should be approved.  The American Law Institute recommends *cy pres* distributions "only when direct distributions to class members are not feasible—either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable."   American Law Institute, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010).   In this case, it was not feasible to identify BofA customers who incurred overdraft fees between January 1, 2001 and December 31, 2003.  Particularly because the claims being settled involve allegations of abusive treatment of customers by a large financial institution, it is reasonable to direct these funds to respected organizations that promote financial literacy.

### 6.     The Opinions of Settlement Class Counsel, Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement

Settlement Class Counsel believe that this Settlement is extraordinary and clearly deserving of Final Approval.  Moreover, opposition to the Settlement has been *de minimis*.  As of September 10, 2011, Settlement Class Counsel had received only 15 *pro se* objections, and the number of opt-outs did not exceeded 169.

### H.     Service Awards

76.     Pursuant to the Settlement, Class Counsel seek, and Bank of America does not oppose, Service Awards of $5,000 per named Plaintiff, or $2,500 per Plaintiff for married couples when both spouses are Plaintiffs.  Agreement ¶ 106.  If the Court approves them, the Service Awards will be paid from the Settlement Fund, and will be in addition to the relief the Class Representatives will be entitled to under the terms of the Settlement.  *Id.*  These awards will compensate the representatives for their time and effort in the Action, and for the risk they undertook in prosecuting the case against Bank of America.

77.     Service awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation. .  Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives.

78.     The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.

79.     The above factors, as applied to the Action, demonstrate the reasonableness of a service award of $5,000 to each Class Representative, or $2,500 to each Class Representative for married couples where both spouses are Class Representatives.  Among other things, each Class Representative took numerous actions and provided substantial assistance to Class Counsel by locating and forwarding responsive documents and information – including monthly account statements and account agreements – and by engaging in conferences with Class Counsel.  In so doing, the Class Representatives were integral to forming the theory of this case.  The Class Representatives not only devoted time and effort to this long-running litigation, but the end result of their efforts, and those of counsel, was a substantial benefit to the Class.  The Class Representatives should be compensated for their service.

80.     If each of the Class Representatives are awarded $5,000, the total service awards will be $135,000.  This is a miniscule percentage of the Settlement Fund of $410 million, and well within the range of reasonable service awards.

**I.     Class Counsels' Attorneys' Fees**

81.     Pursuant to the Settlement, Class Counsel are entitled to request that the Court award us attorneys' fees up to 30% of the Settlement Fund, net of Settlement-related costs and

expenses, plus reimbursement of our litigation costs and expenses.  Agreement ¶ 102.  Bank of America agreed not to oppose Class Counsels' request for attorneys' fees and expenses.  Id.  The Parties negotiated and reached this agreement regarding attorneys' fees and expenses only after reaching agreement on all other material terms of this Settlement.  Agreement ¶ 103.

82.     As indicated in the Court-approved Notice disseminated to the Settlement Class, and consistent with standard class action practice and procedure, Class Counsel request a fee amounting to 30 percent of the $410 million common fund created through our efforts in creating the Settlement Fund, net of Settlement-related costs and expenses.  Class Counsel are not, however, requesting reimbursement of our litigation costs and expenses.

### 1.     The Claims Against BofA Required Substantial Time and Labor.

83.     Prosecuting and settling the claims in the Action demanded considerable time and labor, making this fee request reasonable.  Moreover, had we not mounted a vigorous challenge to the *Closson* settlement, BofA's exposure in the Action would have been drastically reduced, if not eliminated altogether.

84.     Throughout the pendency of the Action, the internal organization of Class Counsel, including assignments of work, weekly conference calls, and oversight of task-oriented subcommittees, ensured that we were engaged in coordinated, productive work efforts to maximize efficiency and minimize duplication of effort.  To the same ends, in-person meetings of Class Counsel were also held at various times during the course of the litigation.

85.     Class Counsel spent hundreds of hours investigating the claims of many dozens of potential plaintiffs against BofA in this MDL.  Class Counsel interviewed more than 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers.  Class Counsel also obtained, reviewed, sorted, and analyzed dozens of BofA deposit account agreements.  This information was essential to our ability to understand the

nature of BofA's conduct, the language of the account agreements at issue, and potential remedies.

86.     Class Counsel expended significant resources researching and developing the legal claims at issue.  For example, state-by-state legal surveys were necessary to determine which state common law doctrines and consumer protection statutes provided Plaintiffs with viable claims.

87.     Class Counsel faced a significant hurdle with the filing of the Omnibus Motion, as to which BofA was one of the moving parties.  [**DE # 217**].  Substantial legal research was necessary to oppose the Omnibus Motion, as well as a considerable briefing effort that ultimately resulted in Plaintiffs' 98-page Opposition Brief.  [**DE # 265**].  We also convened in advance of oral argument on the Omnibus Motion to prepare for the day-long argument held on February 25, 2010.  [**DE # 294**].

88.     Discovery in the First Tranche actions was stayed – at the banks' request – pending resolution of the Omnibus Motion.  [**DE # 148**].  On May 13, 2010, approximately two months after the Court allowed the claims to proceed, the Court lifted the stay of discovery and entered a comprehensive Scheduling Order.  [**DE # 463**].  The very same day, we served identical written discovery requests on each of the Defendants, seeking relevant and probative documents and information in their possession.  The process of developing, refining and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required considerable effort by us.

89.     BofA produced over one million pages of documents in response to Plaintiffs' discovery requests, and also served response to Interrogatories and Requests for Admissions.  It

also asserted layers of blanket, boilerplate objections to our discovery requests.  On July 16, 2010, Plaintiffs moved to compel discovery from BofA.  [**DE # 691**].

90.    Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort, and code the produced documents.  To make the review and subsequent litigation more efficient, we established uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.  Such document review efforts and coordination were essential – and account for a large proportion of the attorney time expended in this Action.

91.    During the Summer and Fall of 2010, we began the process of negotiating with BofA's counsel (as well as counsel for other First Tranche Banks) regarding Rule 30(b)(6) deposition topics.  In addition, Class Counsel expended significant time and effort to prepare responses to BofA's interrogatories and requests for production of documents directed to the Plaintiffs, and to successfully defend against BofA's motion to compel discovery.  [**DE # 902, 939, 1016**].

92.    Beginning in mid-October 2010, Settlement Class Counsel began preliminary settlement discussions with BofA's counsel.  In December 2010 and again in January 2011, we prepared for and participated in three separate days of mediation in various locations in an attempt to settle the Action.

93.    After the Parties executed the MOU in connection with the Settlement, Settlement Class Counsel engaged in protracted discussions and drafting over the terms of the Settlement Agreement, as well as settlement-related analysis to determine – among other things – an appropriate plan for allocation of the Settlement funds.  That process required us and our experts

to analyze transactional data concerning overdraft fees imposed upon Settlement Class members, and to determine the most appropriate distribution formula in light of BofA's data.  In addition, we directed and oversaw Class Counsels' post-MOU confirmatory discovery, including ongoing document review and coding as well as regular conference calls, pending final approval of the Settlement.

94.     All told, Class Counsel's steadfast and coordinated work paid great dividends for the Settlement Class.  Each of the above-described efforts was essential to achieving the Settlement currently before the Court.  Taken together, the time and resources Class Counsel devoted to prosecuting and settling the Action of nationwide importance justify the fee we are now seeking.

## 2.     **The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys.**

95.     The Court regularly witnessed and commented upon the high quality of our legal work, which has conferred a significant benefit on the Settlement Class in the face of daunting litigation obstacles.  As the Court is aware, it is extremely challenging to identify, and establish liability based upon, the Debit Re-sequencing that lies at the heart of the Action.  Even from the face of Plaintiffs' bank statements, the proof is not self-evident.  Instead, it requires the acquisition and analysis of a monumental amount of bank data – and the efforts of highly skilled lawyers and experts.  Moreover, the management of this very large MDL, including the individual cases against BofA, among other banks, presented challenges which many law firms are simply not able to meet.

96.     Indeed, litigation of a case like this requires counsel highly trained in class action law and procedure as well as the specialized issues these cases present.  All of the lawyers representing Plaintiffs possess these attributes, and their participation as Class Counsel added

significant value to the representation of this unusually large Settlement Class consisting of millions of individuals.  The record before the Court establishes that the Action involved a wide array of complex and novel challenges, which we met at every juncture based on our extensive experience in complex litigation and class action litigation.

97.     In assessing the quality of representation by Class Counsel, the Court also should consider the quality of their opposing counsel.  BofA is represented by extremely able and diligent attorneys.  These were worthy, highly competent adversaries.

### 3.     The Claims Against BofA Entailed Considerable Risk.

98.     BofA mounted vigorous defenses to these claims, denying any and all liability in the Actions.  The time and expense demands on us were daunting, to say the least, and obviated our ability to work on numerous other matters.  Our success under these circumstances thus represents a genuine milestone.

99.     Prosecuting the Action was risky from the outset.  While several risks existed, we limit our discussion to four of the most serious risks.

100.     *First*, the possibility that the pending appeal in *Closson* would not succeed presented a massive risk.  Indeed, a decision by the California Court of Appeal upholding the *Closson* settlement would likely have erased an estimated *80 percent (or more)* of the value of the Settlement Class Members' claims.  Those claims would have been instantly extinguished. Here, if the California Court of Appeal upheld the trial court's approval of the *Closson* settlement and its all-encompassing release provision, Plaintiffs' only chance for preserving this huge portion of the Settlement Class Members' claims would likely be through a collateral attack on the judgment in *Closson*.  That would be an extremely challenging undertaking.

101.     *Second*, BofA would have raised its federal preemption argument at all stages of the litigation.  Indeed, this Court emphasized that its preemption ruling in connection with the

Omnibus Motion applied only "[a]t this stage . . ."  694 F. Supp. 2d at 1313.  The centrality of

the preemption issue to BofA's defense is further illustrated by the fact that (1) Union Bank

raised NBA preemption in two of its three main arguments in its recent petition to the Eleventh

Circuit challenging this Court's class certification order under Federal Rule of Civil Procedure

23(f), *see* Eleventh Circuit Case No. 11-90012; and (2) Wells Fargo emphasized the NBA

preemption issue in appealing the *Gutierrez* verdict (*Gutierrez v. Wells Fargo Bank, N.A.*, 730 F.

Supp. 2d 1080 (N.D. Cal. 2010)) to the Ninth Circuit –  devoting more pages to that issue than to

any other in both its opening and reply briefs, *see* Ninth Circuit Case Nos. 10-16959, 10-17468

& 10-17689.  Had this litigation proceeded, BofA undoubtedly would have argued that the NBA

preempts these claims on the grounds that they "significantly interfere" with its federally-

authorized banking powers.  In further support of its argument that the claims conflict with

federal law, BofA would have pointed to commentary by a federal banking agency, the OCC,

suggesting that national banks have discretion to order debits as they see fit and that this decision

falls within their federally-granted powers.  While we believe that these specific claims –

brought under state laws of general applicability, and based on allegations of bad-faith conduct –

are not preempted, there can be doubt that the preemption issue involves complex issues of law

and fact, and presented an ongoing, major risk to Plaintiffs' claims against BofA.

102.    *Third*, BofA would have continued to assert that language in its deposit account

agreement shields it from liability for the claims asserted in the Action.  The agreement states:

"We may determine in our discretion the order of processing and posting deposits, fees, charges,

checks, debits and other items to your account . . . .  We do not process and post transactions in

the order in which they occurred.  In most states we process and post items within each category

from the highest to lowest dollar amount."  *Tornes* TAC, Ex. A at 18.  Such language, BofA

believes, expressly authorized it to engage in the challenged Debit Re-sequencing and, as a material term in the account agreements, foreclosed any finding of breach of the covenant of good faith and fair dealing.  Thus, BofA stated in the Omnibus Motion that "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."  **DE # 217**, at 43-44 (citing 23 Williston on Contracts § 63:22 (4th ed.)).  Nor, BofA added, "may the implied covenant be invoked to limit a party's discretion to follow a course specifically envisioned by the contract's terms."  [**DE # 217**, at 45].  The Court rejected this argument, explaining that Plaintiffs seek only to have the bank exercise its contractual discretion in good faith.  694 F. Supp. 2d at 1315.  However, BofA's contractual language would have allowed it to make the argument to the fact-finder that it told Plaintiffs exactly what it was going to do, and that it cannot be held responsible for Plaintiffs' decision to maintain BofA checking accounts under these terms.

103.    *Fourth*, just as other First Tranche banks seized on the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), to move to compel arbitration, even though they did not initially seek arbitration in this MDL (*e.g*., **DE # 1384**), that development would have afforded BofA a similar opportunity to seek individual arbitrations, and thereby avoid a class-wide finding of liability.  The risk in this regard was reinforced as a result of the Eleventh Circuit's holding in *Cruz v. Cingular Wireless, LLC*, -- F.3d --, 2011 WL 3505016 (11th Cir. Aug. 11, 2011).  *Cf.* Tornes TAC ¶ 84 (BofA's account agreement contains an arbitration clause purporting to "PRECLUDE YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR

31

JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS (HEREINAFTER REFERRED TO AS THE 'CLASS ACTION WAIVER').").

104.    Each of these four risks, standing alone, could have impeded Plaintiffs' successful prosecution of these claims at trial (and in any appeal).  Together, they overwhelmingly demonstrate that Plaintiffs' claims against BofA were far from a "slam dunk" and that, in light of all the circumstances, the Settlement achieves an excellent class-wide result.

### 4.    Class Counsel Assumed Substantial Risk to Pursue The Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.

105.    Class Counsel prosecuted the Action entirely on a contingent fee basis.  In undertaking to prosecute this complex action on that basis, we assumed a significant risk of nonpayment or underpayment.  That risk warrants the requested fee.

106.    Public policy concerns – especially ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs whose individual claims would defy vindication – further justifies the requested fee award.

107.    The progress of the Action to date readily demonstrates the inherent risk that we faced in taking these cases on a contingency fee basis.  Despite our enormous and ongoing effort in litigating before this Court for more than two years, we remain completely uncompensated for the millions of dollars of time and expenses we have invested.  Uncompensated expenditures of this magnitude can severely damage or even destroy law firms.  There can be no reasonable dispute that the Action entailed substantial risk of nonpayment and resulting financial catastrophe for our practices.

108.    Furthermore, the time we spent on the Action was time that we could not spend on other matters.  This factor thus strongly militates in favor of our requested fee.

### 5.   **Class Counsel Achieved an Excellent Result.**

109.    The Settlement we achieved is outstanding.  Instead of facing additional years of costly and uncertain litigation, millions of Settlement Class Members will receive an immediate benefit from a large settlement fund of $410 million.  The Settlement represents an exceptional achievement by any measure.

### 6.   **The Requested Fee Comports with Customary Fees Awarded in Similar Cases.**

110.    The fee requested here matches the fee typically awarded in similar cases.  As legions of decisions have recognized, a fee award of 30 percent of a common fund is well within the range of a customary fee.  Our fee request falls at the low end of the average in the private marketplace, where contingency fee arrangements often approach or equal 40 percent of any recovery.  Moreover, the requested fee falls squarely within the range of awards made in numerous cases brought in this Circuit and District.

### 7.   **Other Factors Also Favor Approving Class Counsels' Fee Request.**

111.    Other factors likewise support granting our fee request.  As noted, the burdens of this litigation have precluded our pursuit of other cases.  The relatively small size of most of the firms representing Plaintiffs, and the major commitment involved in accepting this representation, precluded our firms from working on other matters and accepting other representations.  In addition, our fee request is firmly rooted in "the economics involved in prosecuting a class action."  Without adequate compensation and financial reward, cases such as this simply could not be pursued.

112.    While the Settlement Agreement also authorizes us to seek reimbursement of our out-of-pocket costs and expenses, we are not seeking reimbursement for these costs and expenses.

****

I declare under penalty of perjury of the laws of Florida and the United States that the foregoing is true and correct, and that this declaration was executed in Coral Gables, Florida on September 16, 2011.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

I declare under penalty of perjury of the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on September 16, 2011.

*/s/ Michael W. Sobol*
Michael W. Sobol

34